HOLMES v. DAVENPORT et al.[1]

(Supreme Court, Special Term, New York County.   November, 1891.)

**1. LIFE INSURANCE—PAYMENT OF PREMIUMS WITH STOLEN MONEY.**

Life insurance for the benefit of the wife of the insured was procured, and all the premiums paid with money stolen by the insured from a firm of which he was a member.   The amount stolen exceeded the amount of the policies.   Held, that the entire proceeds of such policies belonged to the firm as against the wife.

**2. SAME—PAYMENT IN PART WITH STOLEN MONEY.**

Where life insurance for the benefit of the wife of the insured is procured with his money, but the subsequent premiums are paid with money stolen by him from a firm of which he was a member, the wife is entitled to the amount of such insurance, charged with a lien for the amount of the premiums paid with stolen money.

**3. SAME—CONSENT OF PARTNERS—EVIDENCE.**

In an action by partners to recover the proceeds of life insurance policies procured with money stolen by the insured from a firm of which he was a member, it appeared that for several years the insured had been taking the money of the firm, and deceiving his partners by periodic false statements.   Some of the premiums were paid by checks drawn by the insured in the firm name on the firm's deposits, and charged to himself in his account in the firm's books.   Held, that such evidence did not show a consent by the copartners to such use by the insured of the funds of the firm.

Action by Charles S. Holmes against William B. Davenport, as administrator of Arthur C. Gilman, deceased, and others, to recover the proceeds of four policies of insurance on the life of decedent, and two certificates of membership in a benefit association.   The policies had been paid, and the proceeds were on deposit with a trust company, when the action was brought.   For decision on motion for injunction *pendente lite*, see 14 N. Y. Supp. 738.

The facts are stated by the referee as follows: "The material facts of the case may be briefly stated.   In December, 1880, Arthur C. Gilman became a member of J. H. Labaree & Co., dealers in teas and coffees in the city of New York, and continued a member of that firm, and the firms that succeeded it under the same name, until his death, which occurred suddenly on December 15, 1890.   During all this time he had, practically, the exclusive charge of the office affairs of the several copartnerships.   Their books of account were kept by him, or under his direction; he had the entire management of their bank-accounts; all notes, checks, and other paper issued in the business of the copartnerships were made by him; and for several years prior to his death it was his custom to prepare and furnish to his copartners semi-annual statements, which purported to show the assets, liabilities, and actual condition of the firm at the dates when the same were rendered.   These statements had been accepted by his copartners without question, as true, they having the most unbounded confidence in his integrity.   The last of such statements was rendered as of the date of December 1, 1890, and showed the firm to be in a highly prosperous condition, with assets exceeding liabilities by nearly the sum of $200,000.   It was delivered to Mr. Labaree about December 11th, and soon thereafter he, for some reason not disclosed, began an investigation of the firm's affairs, which was not completed until after Gilman's death, and which disclosed the uncomfortable fact that the firm was bankrupt, and that its liabilities exceeded its assets by the sum of $36,876.84.   The further discovery was made that this condition of things was owing to Gilman's criminal dishonesty.   During upwards of eight years preceding his death he had steadily plundered his firms of large sums of money which he had appropriated to his own use.   It is not necessary to recite the methods of operation and concealment pursued by him.   The proofs are ·clear and conclusive, and show that between April, 1882, and December, 1890, his embezzlements amounted to more than $220,000.   They also show that the moneys so embezzled, or much the greater portion of them, were deposited by him to his own credit in one or another of several banks with which he had individual accounts, and then drawn out for his own purposes.   Among the papers of

---

[1] Reversed on appeal.   See 19 N. Y. Supp. 151.

Mr. Gilman were found the following policies of insurance upon his life: One for $5,000, issued by the New York Life Insurance Company, and dated March 9, 1880; one for $20.000, issued by the same company, and dated January 7, 1888; one for $10,000, issued by the Provident Life Assurance Society, and dated April 2, 1884; one for $15,000, issued by the Northwestern Mutual Life Insurance Company, and dated October 31, 1884. And also two certificates of Gilman's membership in the Mercantile Benefit Association of New York,—one dated August 1, 1881, and the other dated January 5, 1885. Each of the said four policies was issued on the application of Arthur C. Gilman, made in the name of his wife, the defendant Bessie L. Gilman, and each of them was in terms payable to her. The said two certificates were also issued on application of Mr. Gilman, and the parties have stipulated that in each case 'he signed the application by his own hand, and therein stated that he desired his death loss to be paid to Bessie Lawrence Gilman, his wife.' It does not appear that any of the premiums upon either of the said policies were paid by Mrs. Gilman, or with funds provided by her, or that she had any knowledge, prior to her husband's death, that such policies existed. All of the premiums seem to have been paid by him principally with checks drawn by him upon his private accounts with the Seventh National and Queens County Banks, but occasionally with checks of the firm, drawn by him upon the firm's funds in bank, some of which checks were, and some of where were not, charged to him in his personal account in the firm's books. The plaintiff became a member of J. H. Labaree & Co. at the same time with Gilman, in November, 1880. He was one of the firm at the time of Gilman's death. When the firm was discovered to be insolvent, he provided funds for the payment of its debts and capital for the continuance of its business. His surviving copartners have transferred to him all their right, title, and interest in and to the said policies of insurance, and certificates and the proceeds thereof. On December 26, 1890, the agreement which is set forth in the complaint was entered into, under which the said policies and certificates were delivered to the defendant Olin, as trustee. He has collected the same, and the proceeds, aggregating $56,706.10, he has deposited with the defendant the Union Trust Company. The plaintiff has brought this action, alleging (among many other things) the copartnership relations existing between himself and his assignors and the said Arthur C. Gilman; and that Gilman wrongfully abstracted and appropriated large sums of money belonging to the copartnerships; and that out of such moneys he paid the premiums and assessments by which the said policies and certificates were either procured originally or continued in force and value; and he demands judgment that the proceeds of the said life policies and memberships 'be declared impressed with a trust in favor of the plaintiff,' and that the defendants the Union Trust Company and Olin be required to pay the same over to him, with accumulations of interest thereon."

Before HAMILTON ODELL, Esq., Referee.

*Albert A. Abbott* and *George Hoadley*, for plaintiff. *Stephen H. Olin*, for defendants.

ODELL, R. Before proceeding to consider the main questions which the case presents, mention should be made of the first ground of defense taken by the learned counsel for Mrs. Gilman, which he has argued with great earnestness and skill. He contends that the proofs submitted by the plaintiff fail to establish Gilman's guilt; that is, that they are not so direct and conclusive that they "exclude every theory consistent with Gilman's innocence." In my judgment, the circumstantial evidence is of the most convincing character, and demonstrates the criminality of Gilman beyond any reasonable doubt. It more than satisfies what was held to be sufficient in *Ferry Co.* v. *Moore,* (N. Y. App.) 6 N. E. Rep. 293, where Judge EARL said that the circum-

stances "all point in one direction. They do not exclude every hypothesis but that of Moore's wrong-doing, but they all harmonize with that of his guilt. His innocence may be possible. But courts, in weighing evidence and reaching conclusions, do not deal with possibilities, but with probabilities." The partnership relation is one of trust and confidence. Judges have used strong language in describing and defining it. "The principles upon which the relationship of copartners is founded are strict and exacting, demanding entire good faith towards each other, and the highest standard of morality, integrity, and fair dealing." MILLER, P. J., in *Bank* v. *Cox*, 2 Hun, 572. "A purer and more elevated morality is demanded of partners than the common morality of trade, and the standard by which they are tried in a court of equity is far higher than the standard of the world." BARRETT, J., in *Platt* v. *Platt*, 2 Thomp. & C. 39. "The functions, rights, and duties of partners in a great measure comprehend those both of trustees and agents, and the general rules of law applicable to such characters are applicable to them." EARL, C., in *Mitchell* v. *Reed*, 61 N. Y. 123. It is a plain proposition—nobody in this case disputes it—that the copartnership moneys of which Gilman was placed in charge were in his charge in trust, and that his duties in respect of them were those of a trustee for his copartners. We have, then, the case of trust funds embezzled by a trustee, and appropriated in part to his own uses, and in part invested for the future benefit of a third party, without her knowledge, and without any consideration moving from her. Such a wrong the law is ever eager to redress. It permits no man "to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Riggs* v. *Palmer*, 115 N. Y. 511, 22 N. E. Rep. 188; *Silsbury* v. *McCoon*, 3 N. Y. 379. An abuse of trust can confer no rights on the party abusing it, nor on those who claim in privity with him. *Taylor* v. *Plumer*, 3 Maule & S. 574. Equity will follow a trust fund through any number of transmutations, and preserve it for the *cestui que trust*, so long as it can be identified. In *Pennell* v. *Deffell*, 4 De Gex, M. & G. 372, 388, Lord Justice TURNER said: "It is, I apprehend, an undoubted principle of this court that as between *cestui que trust* and trustee, and all parties claiming under the trustee, otherwise than by purchase for valuable consideration, without notice, all property belonging to a trust, however much it may be changed or altered in its nature or character, and all the fruit of such property, whether in its original or its altered state, continues to be subject to or affected by the trust." The rule is stated fully and clearly by Judge ANDREWS in *Newton* v. *Porter*, 69 N. Y. 133: "In courts of equity the doctrine is well settled, and is uniformly applied, that when a person, standing in a fiduciary relation, misapplies or converts a trust fund into another species of property, the beneficiary will be entitled to the property thus acquired. The jurisdiction exercised for the protection of a party defrauded by the misappropriation of property, in violation of a duty owing by the party making the misappropriation, is exceedingly broad and comprehensive. The doctrine is illustrated and applied most frequently in cases of trusts, where trust moneys have been, by the fraud or violation of duty of the trustee, diverted from the purposes of the trust, and converted into other property. In such case a court of equity will follow the trust fund into the property into which it has been converted, and appropriate it for the benefit of the beneficiary. It is immaterial in what way the change has been made, whether the money has been laid out in land, or land has been turned into money, or how the legal title to the converted property may be placed. Equity only stops the pursuit when the means of ascertainment fail, or the rights of *bona fide* purchasers for value, without notice of the trust, have intervened." The books abound in cases holding this familiar and reasonable doctrine. *Day* v. *Roth*, 18 N. Y. 452; *Van Alen* v. *Bank*, 52 N. Y. 1; *Haddow* v. *Lundy*, 59 N. Y. 320; *Stephens* v. *Board*, 79 N. Y.

186; *Barry* v. *Lambert*, 98 N. Y. 300; *Price* v. *Brown*, Id. 395; *Cavin* v. *Gleason*, 105 N. Y. 256, 11 N. E. Rep. 504; *Hooley* v. *Gieve*, 9 Abb, N. C. 8; *May* v. *Le Claire*, 11 Wall. 236; *Cook* v. *Tullis*, 18 Wall. 341; *Sadler's Appeal*, 87 Pa. St. 154; *Englar* v. *Offutt*, 70 Md. 78, 16 Atl. Rep. 497.

Relying upon these principles, the plaintiff's contention is that the policies in question were purchased with and represent or stand in the place of moneys belonging to Labaree & Co., feloniously taken by Gilman in violation of his duty as trustee, and that the plaintiff, as assignee of Labaree & Co., is entitled to the policies, and to substantially the whole of their proceeds, on the ground that such proceeds are the profits or products of the trust moneys so embezzled. This the defendant Bessie L. Gilman strenuously denies. She admits that (I quote from her counsel's brief) "if Arthur Gilman had stolen money from the plaintiff, and with it had bought a jewel or certificate of stock as a gift for his wife, the plaintiff could take the jewel or the stock, even if it was worth more than the purchase price." This is undoubtedly correct. Her second proposition is that if the stolen money had been mingled with money of the stealer, or with money of his wife, and then expended for the jewel or the stock, or used in improving land or other property belonging to the wife, then the plaintiff would have a lien or could enforce a trust only for the amount of the stolen money, and the surplus would be the property of the wife. This is also correct. It is then insisted that, assuming that all the premiums upon the policies in question were paid by Gilman out of the stolen moneys, the proceeds of the policies are not the fruit of those premiums only, because Mrs. Gilman had an insurable interest in her husband's life, which was property, and which she contributed to the contract of insurance; and therefore the policies were produced by the commingling of this insurable interest with the stolen moneys. This strikes me as a novel proposition. I will restate it in the learned counsel's own language: "The insurable interest, which the law recognizes as her property, a real right of property, was intrusted to him, and was by him mingled with the money stolen by him." And in his brief he says: "If Arthur Gilman used stolen moneys to pay the premiums on policies of insurance, based on his wife's insurable interest in his life, he was insuring her own property, property recognized and protected by our laws, and the proceeds of the insurance belong to her, subject, at most, to a possible obligation to account for the premiums paid by him." And again: "The plaintiff's money was mingled with her property without her knowledge and without her fault."

It seems to me that this argument rests on a false foundation. One error consists in regarding a wife's insurable interest in her husband's life as property. What is an "insurable interest" in a human life? In *Warnock* v. *Davis*, 104 U. S. 775, the court said: "It is not easy to define with precision what will in all cases constitute an insurable interest so as to take the contract out of the class of wager policies. It may be stated generally, however, to be such an interest, arising from the relations of the party obtaining the insurance, either as creditor or surety for the assured, or from the ties of blood or marriage to him, as will justify a reasonable expectation of advantage or benefit from the continuance of his life. It is not necessary that the expectation of advantage or profit should be always capable of pecuniary estimation. * * * But in all cases there must be a reasonable ground, founded upon the relation of the parties to each other, either pecuniary or of blood or affinity, to expect some benefit or advantage from the continuance of the life of the assured." A child has such an interest in the life of a parent, a creditor in the life of his debtor, a partner in the life of a copartner, a master in the life of his servant. If a policy upon a life is obtained by one who has no interest in the life, it is void, as a wager policy. *Ruse* v. *Insurance Co.*, 23 N. Y. 523. The insurable interest of a wife in the life of her husband existed at common law. *Baker* v. *Insurance Co.*, 43 N. Y. 287; *Brummer* v.

*Cohn*, 86 N. Y. 14. Yet the common law denied the widow any pecuniary redress from a wrong-doer, by whose negligent or criminal act her husband's life had been destroyed. The remedies given by statutes for such wrong are "unknown to the common law, created by the acts, for damages or injuries also created by the acts; for, in a legal or judicial sense, damages or injuries for which there is no legal redress are not damages or injuries. These acts which create the remedy for the benefit of the widow and next of kin, also create the wrong as to them." *Beach* v. *Steam-Boat Co.*, 30 Barb. 436. I can see nothing in a wife's insurable interest in her husband's life that can be correctly described as "property," or that resembles property, or that is capable of being contributed by the wife towards a contract of insurance, or of being "commingled" with the premiums paid, so that the proceeds of the policy can be properly described as the joint product of such an interest and premiums. The law permits the insurance to be made if the interest exists, and the insurance is upon the husband's life, not simply upon the wife's insurable interest therein.

It is held in this state that a life insurance is not, like a fire insurance, a contract of indemnity, but "a mere contract to pay a certain sum of money on the death of a person, in consideration of the due payment of a certain annuity for his life. Like every other contract to pay money, such a policy is a chose in action, with all the ordinary incidents of every other chose in action." *Olmstead* v. *Keyes*, 85 N. Y. 598; *Rawls* v. *Insurance Co.*, 27 N. Y. 289. Therefore a party may insure his own life for the benefit of a stranger who has no interest therein. So a policy, valid in its inception, may be assigned like any other chose in action, and will continue valid in the hands of the assignee, although he may have no interest in the insured life. Same cases. So a creditor, who procures insurance upon the life of his debtor, may enforce the policy, although, before it becomes payable, his debt be paid or his debtor be discharged in bankruptcy. *Ferguson* v. *Insurance Co.*, 32 Hun, 306. It is true that, where the insurance is upon the life of a husband for the benefit of his wife, the assignability of the policy before its maturity is regulated and restricted by the statute, but this does not in any respect affect the nature or the character of the contract of insurance; it is a contract to pay money, and the instrument that evidences it is a chose in action.

Now, it is conceded that if the moneys embezzled by Gilman and paid for premiums had been invested by him, in his wife's name, in notes or bonds or stock, or in any speculative enterprises, the plaintiff would be entitled to demand and recover such investments. All increase of values and all profits resulting from the investments would belong to him. Why is not his right equally clear and certain to an obligation of an insurance company to pay a sum of money to Mrs. Gilman upon Gilman's death, the entire consideration for which obligation was paid by Gilman with the stolen moneys? It is said that Gilman never had any title to or interest in the policies in question; that the contracts of the insurance companies were not made with him, but with Mrs. Gilman; that the policies became her separate and absolute property as soon as they were issued; and that she is consequently entitled to receive the proceeds free from any claim or interference on the part of the husband's creditors. The case of *Bank* v. *Hume*, 128 U. S. 195, 9 Sup. Ct. Rep. 41, is pressed upon me as establishing this doctrine, and as decisive of the present action. In that case Hume had obtained insurance upon his life in several companies for the benefit of his wife. The applications were made by him in her name, and the policies were payable to her. Some of the premiums were paid by Hume out of moneys belonging to his wife; some were paid by him out of his own moneys while he was insolvent. Upon his death his creditors sought to reach the proceeds of the policies, and have the same appropriated to the payment of their claims. Their contention, as stated by Chief Justice FULLER, was as follows: "Mr. Hume having been insolvent

at the time the insurance was effected, and having paid the premium himself, it is argued that these policies were within the provisions of 13 Eliz. c. 5, and inure to the benefit of his creditors as equivalent to transfers of property with intent to hinder, delay, and defraud." But the court held that the statute of Elizabeth applied only to property which the debtor could have made available for the payment of his debts; that it "is the general rule that a policy, and the money to become due under it, belong, the moment it is issued, to the person or persons named in it as beneficiary or beneficiaries, and that there is no power in the person procuring the insurance, by any act of his, by deed or by will, to transfer to any other person the interest of the person named;" that the interest insured (in *Hume's Case*) was neither the debtor's nor his creditors'; that the contracts were not payable to the debtor or his representatives or his creditors; that there had been no fraud on the part of the wife or the insurance companies; that although Hume had paid the premiums out of his own funds when insolvent, and such payments were within the statute of Elizabeth, yet that would not give the creditors any interest in the proceeds of the policies, which, for the reason stated, belonged to the beneficiaries; and that the creditors were not entitled to recover even the premiums paid, because they formed no part of the proceeds of the policies. The court said: "This argument in the interest of creditors concedes that the debtor may rightfully perserve his family from suffering and want. It seems to us that the same public policy which justifies this, and recognizes the support of wife and children as a positive obligation in law as well as morals, should be extended to protect them from destitution on the debtor's death by permitting him, not to accumulate a fund as a permanent provision, but to devote a moderate portion of his earnings to keep on foot a security for support already, or which could thereby be, lawfully obtained, at least to the extent of requiring that, under such circumstances, the fraudulent intent of both parties to the transaction should be made out. And inasmuch as there is no evidence from which such intent on the part of Mrs. Hume or the insurance companies could be inferred, in our judgment none of these premiums can be recovered."

Briefly stated, the doctrine of the *Hume Case* is that the appropriation by a debtor in failing or insolvent circumstances of a "moderate portion" of his income to the procuring or continuing of insurance upon his life, for the benefit of his wife or family, is not a fraudulent use or diversion of so much of his property of which his creditors can complain; that it is a use which public policy approves and the law defends; that, therefore, the premiums paid cannot be followed and reached by creditors of the insolvent, in the absence of a fraudulent intent on the part of the party or parties to be benefited by the insurance contract; and that the moneys paid for premiums being the moneys of the debtor, and lawfully expended by him in the purchase of a policy for the benefit of his wife, and payable to her, her title to such policy is perfect from the moment it is issued, and the right to receive the proceeds of it is absolute as against all parties. As the policy never belonged to the debtor, his creditors can have no claim to its proceeds; neither can they recover the premiums out of the proceeds, because, as the court said, "the premiums form no part of the proceeds of the policy;" neither can they have a trust impressed upon the proceeds to the extent of the premiums paid by the debtor, because such payments were lawfully made, and were not, in any sense, in fraud of creditors.

The statute of this state is in exact accord with the principle of public policy referred to in the opinion in the *Hume Case.* It permits a husband, although insolvent, to pay out of his "property or funds" for premiums, for the benefit of his wife, a sum not exceeding $500 annually; and it declares that "the amount of the insurance becoming due and payable by the terms of the insurance shall be payable to her, and for her own use, free from the

claims of the representatives of the husband, or of any of his creditors, or any party or parties claiming by, through, or under him." Laws 1870, c. 277. But both the *Hume Case* and the statute have reference to funds or property belonging to the husband, of which he has the right of disposition, and which he, in fact, uses for the benefit of his wife and children. A man who is indebted is said to sustain two distinct relations to his property,—that of owner and that of *quasi* trustee for his creditors. *Candee* v. *Lord*, 2 N. Y. 274. "The laws lays upon him an obligation to pay his debts, and holds him, in behalf of his creditors, to the exercise of good faith in all transactions relating to the fund upon which they must depend for payment." Creditors have an equitable interest in their debtor's property, and the means he has of satisfying their demands. *Seymour* v. *Wilson*, 19 N. Y. 418. Now, in the *Hume Case*, the court holds that, notwithstanding the fact that a man is indebted to the degree of insolvency, yet he may take from his assets and resources a reasonable sum annually, and devote it to making provision, by insurance upon his life, for the support of his family after his death, in defiance of the claims of his creditors, and without perpetrating upon them a legal fraud. And by the New York statute the rights of the husband's creditors are disregarded and denied in favor of the wife, to the extent, annually, therein provided. In both cases the controlling principle is public policy. In this state an insurance in favor of the wife upon her husband's life, the premiums for which are paid by him out of his own funds, is valid, and the proceeds of the insurance belong to her as against the world, not because she has parted with any consideration, or contributed her "insurable interest" to the contract, or commingled her property with the premiums to produce the policy, but because of the peremptory declaration of the statute.

But there is in the present case a fact which in my judgment forbids the application of the rule declared in *Bank* v. *Hume*. Here the moneys with which the premiums were paid and the policies procured (except as stated hereinafter) were not the moneys of the defendant or of her husband. They were stolen moneys,—stolen by Gilman from the plaintiff and his assignors. He acquired them by crime. All his subsequent dealings with them—retention, possession, use, investment—were criminal,—continuations or extensions of the original felonious acts. Having no title to them, he could confer no title upon any other person not a transferee for value and in good faith. He could confer no title upon his wife by gift. He could not invest the moneys in any way for her benefit, so that she could acquire title to or interest in the investment as against the party from whom the moneys had been stolen. He could not contract with them for the future benefit of his wife, purchasing for her the bond or obligation of an insurance company to pay her money upon his death. It is error to say that all these policies, when issued, became the property of Mrs. Gilman. No matter what her rights to them and their proceeds may be as against mere creditors of her husband, it is certain, I think, that she can have no claim to either, beyond what is allowed her in this action, as against the plaintiff.

The case of *Shaler* v. *Trowbridge*, 28 N. J. Eq. 595, is very similar in its facts to the case in hand. Trowbridge was a partner in business with the plaintiffs. He had charge of the books and the financial matters of the firm. After his death, discovery was made that the accounts kept by him were false, and that he had embezzled and appropriated large amounts of the moneys of the firm, some of which he had invested in policies of life insurance, payable to himself. These policies he afterwards had transferred and made payable to his wife. The surviving partners brought their action in equity to have their right established to the entire proceeds of the policies, and it was held that they were entitled to the relief demanded. The court said that, "in equity, a distinction can never be drawn between the money misappropriated and the results of the investment in favor of the fraud-doer. Nor does it

make any difference that the investment turns out to be a profitable one, for, whatever the profit may be, it must belong to the *cestui que trust.* The fact that this property has been passed into the hands of the wife does not prevent the application of these equitable principles. She received it as a gift from her husband, without paying any consideration whatever for it. When once a fraud has been committed, not only is the person who committed the fraud precluded from deriving any benefit from it, but every innocent person is so likewise, unless he has in good faith acquired a subsequent interest for value; for a third person, by seeking to derive any benefit under such a transaction, or to retain any benefit resulting therefrom, becomes *particeps criminis,* however innocent of the fraud in the beginning. It is urged that a life policy should be exempt from the equitable rule which applies to other transactions, because it differs in its character from ordinary investments, and is a beneficial provision for the family, which should be favored. Public policy clearly forbids the adoption of this suggestion. It would invite the commission of the wrong by assuring the wrong-doer that there is one mode in which he could surely profit by his turpitude in securing a provision for his family. The policy is the thing which the partnership's money purchased, and it stands in the place of what was corruptly abstracted. * * * The fact that it has a contingent value does not distinguish it in principle from an investment in the purchase of stock, or of an annuity, and can give no support to the claim of the widow that nothing should be exacted of her beyond the amount of the premiums paid upon it out of the firm funds. * * * It would be idle to denounce his turpitude, and at the same time to reward it by allowing him to transmit its fruits to his family. His wife can derive, through so corrupt a source, no equitable rights to these policies. Neither public policy nor the intrinsic justice of the case would be promoted by permitting her to do so." The learned counsel for the defendant has vigorously contended that *Shaler* v. *Trowbridge* does not apply to the present case, "because the *status* of married women was so different in New Jersey that the rights on which Mrs. Gilman's claim rests were not possessed by Mrs. Trowbridge." But the question in both cases is the same. It is whether a wife can acquire by gift from her husband title to moneys misappropriated by him, or title to property into which such moneys have been converted by him. It is whether a widow can retain the fruits of her husband's wrongdoing to the injury of the person to whom the wrong was done. It must be answered by a reference to the fixed and certain principles of equity jurisprudence, and the answer must be the same in every civilized jurisdiction. I am unwilling to believe, and should be sorry to discover, that the state of New York had, either by statute or judicial decision, conferred any special or extraordinary rights or privileges upon a wife or widow in such case.

The remaining question is as to the respective rights of the plaintiff and Mrs. Gilman in the proceeds of these several policies. The first in order of date is a policy of the New York Life Insurance Company for $5,000. It was issued on March 9, 1880, and is in terms payable to Mrs. Gilman. It is not denied that the premiums on this policy down to April, 1882, were paid by Gilman with moneys which he had honestly acquired, and which the law authorized him to apply in such manner for the benefit of his wife. The contract of insurance became complete upon the payment of the first premium on March 11, 1880. It belonged to Mrs. Gilman. *Whitehead* v. *Insurance Co.,* 102 N. Y. 143, 6 N. E. Rep. 267. It is like the policy of the Life Insurance Company of Virginia in the *Hume Case,* of which the court said: "It is conceded by counsel for the complainants that this contract was perfectly valid as against the world,"—the first premiums having been paid by Hume before he became insolvent or financially embarrassed. The proceeds of this policy belong to Mrs. Gilman, charged with a lien for the amount of later premiums paid by her husband out of the misappropriated funds. These later premi-

ums amount, exclusive of interest, to $819.05. The claim made in behalf of the plaintiff that his moneys saved the policy from forfeiture, and therefore he is entitled to either the whole of the proceeds, less the amount of the premiums honestly paid by Gilman, or to a percentage of such proceeds bearing the same relation to the whole thereof as the amount of his moneys paid for premiums bears to the whole amount of premiums paid, is without any support, that I have been able to discover, in either law or morals. The policy for $10,000, issued by the Provident Company, and dated April 2, 1884, that for $15,000, issued by the Northwestern Mutual, and dated October 31, 1884, and that for $20,000, issued by the New York Company, and dated January 7, 1888, were all procured and maintained by the use of plaintiff's money. He is entitled to their proceeds. It appears that some of the premiums were paid by checks drawn by Gilman on the firm's name upon the firm's deposits, and charged by him to himself in his account in the firm's books. I agree with the learned counsel for the plaintiff that, under the circumstances, the copartners cannot be held to have consented to such use of the firm's funds by Gilman, and that he acquired no title thereto. He was a debtor to the firm on his account when each of the checks was drawn, and the copartners were ignorant of the fact that he was then systematically embezzling the moneys of the firm, and concealing his embezzlements and deceiving his copartners by periodical statements which were false and fraudulent. Under such circumstances, no consent on the part of the copartners to the drawing of said checks by Gilman, and the application of their proceeds to his personal use, can be implied from their silence or failure to object. It was held in *Persch* v. *Quiggle*, 57 Pa. St. 248, that an agent can derive no advantage from anything done by the principal in ignorance of what it was the duty of the agent to communicate, and, in any agreement made with the principal which releases the agent, the agent must show that the principal knew the actual condition of his property. This rule is applicable and controlling here. The certificate of membership No. 1676, in the Mercantile Benefit Association, was issued on the 1st of August, 1881. Mrs. Gilman's right to receive the death loss accrued, then, prior to the commencement of Gilman's plunderings. There is no direct proof, and I am unwilling to find as a fact upon mere inferences, that the assessments upon that certificate, or the assessments upon the later certificate, No. 246, were paid with the moneys of Labaree & Co. Mrs. Gilman is entitled to the proceeds of both certificates. I will hear counsel on the question of costs.