## DAYTON v. H. B. CLAFLIN CO.

(Supreme Court, Trial Term, New York County. July 15, 1896.)

1. LIFE INSURANCE—THEFTS TO PAY PREMIUMS—RIGHTS OF BENEFICIARY.
   The beneficiary in a life insurance policy procured with stolen moneys is not an innocent third person as against the person from whom the moneys were stolen, but takes the policy subject to the means by which it was procured.

2. SAME—IDENTIFICATION OF STOLEN FUNDS—BURDEN OF PROOF.
   Where the proceeds of a life insurance policy procured are claimed by a third person on the ground that the policy was procured with money stolen from him by the insured, the burden of following the alleged stolen money into the premiums does not remain absolutely on claimant until the end of the case, but may be shifted by showing that the probabilities are that the stolen moneys went into the premiums.

3. SAME—RIGHT TO PROCEEDS OF POLICY.
   Where the premiums on a life insurance policy were paid with stolen moneys, and the amount of the thefts equals the amount of the policy, the person from whom such moneys were stolen is entitled to the proceeds of the policy.

4. SAME—SUFFICIENCY OF EVIDENCE.
   The payment of premiums with stolen moneys is established by showing that the insured had no other income than his salary, which was insufficient

to support him in the style in which he lived; that shortly before the policy was issued he stole from his employers sums largely in excess of the premiums; that subsequent premiums were paid by checks on insured's bank account, to which large sums of stolen money were positively traced; that the probabilities were that the residue of the account, with the exception of trivial sums, was also made up of stolen money, though the amount not stolen was sufficient to pay some of the premiums; and that the thefts continued in increasing amounts until the death of insured.

Action by Julia A. Dayton against the H. B. Claflin Company, substituted as defendant in place of the Mutual Life Insurance Company of New York, on two policies of life insurance. Judgment for defendant.

Argued before DONALD McLEAN, Esq., Referee.

Baldwin & Blackmar, for plaintiff.
Gould & Wilkie, for defendant.

McLEAN, R. The action was originally brought by the plaintiff against the Mutual Life Insurance Company of New York, to recover the amount of two policies of life insurance, for $5,000 each, upon the life of Henry W. Dayton, her deceased husband. The plaintiff's allegation of claim was that she was the beneficiary named in one of the policies, and the assignee of the other. The H. B. Claflin Company, a corporation, having made claim upon the insurance company for the proceeds of the same policies, on the ground that such proceeds equitably belonged to it, the life insurance company moved for an interpleader of the said claimant. The motion was granted; and the fund, the proceeds of the two policies, having been paid into court by the insurance company, it was referred to me to determine, as between plaintiff and defendant, the ownership of this fund, the entire amount thereof being claimed by each party.

The action is one in equity, and must be determined by the application of equitable rules and principles. The claim of equitable ownership asserted by the defendant grows out of the alleged fact that Henry W. Dayton, upon whose life the policies of insurance were issued, was a thieving employé of the defendant, who had robbed it of a large amount, two or three times the amount of the fund in court; and that the said fund was produced by the payment of premiums on the policies out of which it grew, with the money of defendant, as stolen by H. W. Dayton.

Although 82 witnesses were examined, and the testimony taken consisted of about 1,000 typewritten pages, there are but few questions of fact in dispute. The following history of Henry W. Dayton's life is digested from practically uncontradicted testimony: He was born about 1864, being one of three brothers, one older and one younger than himself, and, while young, lived with his parents, who took care of him. His father was, and is, a clerk of a house where he has been employed since 1857. His father's accumulation of property seems to have consisted only of a house in Williamsburgh, which cost, some years ago, $6,250, and on which there still remains a mortgage of $2,000. In the purchase of this little house, father and sons contributed to the extent of their

ability, the title being taken in the name of the mother. Henry W. had no relatives of any means, his uncles all being employed on salary. He had never inherited any property from any one. His elder brother entered the employ of H. B. Claflin & Co. at the age of 13, at a salary of $100 per annum, and he is still in the employ of that firm's successor, the defendant herein. Henry W. entered the employ of the same firm in 1878, at a salary of $100 per annum, and continued with the firm and this defendant until March 27, 1894, when he committed suicide. Henry W.'s salary was increased from time to time, until 1887, when he was an assistant in the credit department, receiving $1,000 per annum. In that year he married a girl who had theretofore been contributing to the support of her family by her salary. Her sister married a mechanic, working by the day at his trade. His wife brought him no money or other property, but increased expenses, and died, after a lingering illness, in December, 1888. At the time of his marriage, Mr. Claflin gave him $100; and in January, 1889, he was given by the firm a "bonus" of $100. From 1889 to the time of his death his salary was $1,200, payable $83.33 on the 15th of each month during the year, and $200, "retained salary," which was paid in lump about the beginning of the new year. Except the embezzlements and thefts which will be mentioned, the evidence disclosed no other source of income or acquirement of any other money by Dayton up to the time the policies of life insurance in question were taken out. Dayton married the plaintiff on June 4, 1890. Prior to her marriage, the plaintiff lived with her mother, a widow, who kept a small retail dry-goods store on Ninth avenue, near Twenty-Third street, in New York City. For about six years, plaintiff had assisted her mother in the store, no other help being employed, and she and her mother lived in an apartment over the store. In April, 1890, in view of plaintiff's approaching marriage to Dayton, her mother closed out the business, and purchased a two-story and basement brown stone house, built on a full city lot, known as "457 Hancock Street," Brooklyn. Here Dayton and plaintiff lived after their marriage, plaintiff's mother residing with them. The household expense were divided between Dayton and his mother-in-law. Dayton's share contributed for "actual living expenses" was not less than $600 per annum, according to plaintiff's statement. The comfort of this house, and the mode of life there, were quite different from those of the Ninth avenue store and apartment. One servant was kept, and sometimes two, and, for a time, a nurse besides. Dayton gave "course dinners" at his home. He belonged to a "driving club"; hired coaches and coupés from livery frequently; and from September, 1892, to the time of his death, kept a horse of his own at livery, at an expense of $25 per month; and, during a part of that period, kept two horses, at an expense of $50 per month. He and the plaintiff attended the races at Coney Island. Various other points in evidence showed an extravagance not compatible with the idea that the expenses thus incurred, in addition to his contribution to the household expenses and his necessary personal expenses, could have been

met by his salary of $1,200 per annum. But, in addition to his salary, we find him in receipt of large sums of money stolen and embezzled from the defendant and its predecessor, H. B. Claflin & Co. In 1889 the duties of Dayton's position required him to attend to the payment of taxes, assessments, water rates, etc., upon the real estate of his employers, and he was also intrusted with the collection of interest and principal of a large number of bonds and mortgages owned by it, and standing in the name of John Claflin. The nature of these duties, and the full confidence of his employers, furnished the opportunity and the means to successfully accomplish the embezzlements and thefts, which were made in one of four ways: (1) He secured from the cashier of his employers sums in cash for the alleged purpose of paying taxes, assessments, and water rates on real estate. These alleged charges were fictitious, and the money so obtained was used by Dayton for his own purposes. (2) He secured cash or checks of defendant to the order of a real person, but upon false representations to the defendant, and secured for his own use the amount thereof. (3) He secured checks of the defendant made payable to persons not entitled to the same, although the public charges for payment of which he stated the checks were to be used were generally proper ones. The signatures of the payees were forged by Dayton, and the proceeds secured and used by him personally. (4) He collected money due on account of principal and interest on various bonds and mortgages owned by H. B. Claflin & Co., and embezzled the same. The first of the thefts proven was within two or three weeks of the death of his first wife. On January 11, 1889, he obtained from the cashier of H. B. Claflin & Co. $78.40, for the payment of an alleged assessment on real estate. During the year 1889 he obtained in the same way, for fictitious charges on real estate, the sum of $397.50. During the year 1890 he pursued the same method, but increased the amount, having stolen in that year the sum of $979.06. These amounts, aggregating $1,376.56, were stolen prior to taking out the first of the two life insurance policies, being No. 426,685, bearing date November 24, 1890, and in which this plaintiff is named as beneficiary; the first premium being paid by Dayton to the insurance agent about December 5, 1890. This payment was made with the check of the defendant, given to Dayton in exchange for cash, the amount being $77.55. The premium was thereafter reduced to $76, and six other payments of premium were made prior to his death. The second premium was paid in cash on May 22, 1891. The second policy, being No. 464,364, was issued to Dayton on September 10, 1891, and was thereafter assigned by him to this plaintiff. The first premium on this second policy, $57.45, was paid by him on that day in cash. The third premium, on policy No. 426,688, was paid on November 24, 1891, by the check of this defendant, and the amount, $76, charged by it to an account standing on its books in the name of the plaintiff. All the other premiums on both policies were paid after the opening of a bank account by Dayton in the Liberty National Bank.

The question before me relates to the title to the entire fund now in

court, and I do not consider it necessary to further treat separately the two policies out of which the fund arose. The question of the invalidity of the assignment of one of them, for want of consideration, was not pursued on the trial, and, in the view I take of the case, would not be material. There were 13 payments of premiums on both policies, 7 on one, and 6 on the other; and I will hereafter treat of them in the chronological order of payment, from 1 to 13. I have already alluded to the first 4, paid before the opening of the Liberty National Bank account, and on the following dates: (1) December 5, 1890; (2) May 22, 1891; (3) September 10, 1891; and (4) November 24, 1891. The fourth premium, paid from funds out of an account standing in the plaintiff's name, will be referred to separately, as will .the thirteenth and last payment, which was made by check of one Alexander. All the other payments, the proof clearly establishes, were made by checks drawn on Dayton's account with the Liberty National Bank.

I have availed myself of the very full and able briefs of counsel, and have re-read the entire testimony in the light of the respective briefs. In stating the conclusions at which I have arrived, I will not attempt to express in detail and point by point the steps by which I reached them. In one or two particulars, to my mind of fundamental importance, I differ entirely from the contention of the plaintiff's counsel, who argues, in effect, that plaintiff's attitude under the proofs in the case is that of an innocent third person, who need not take the policies or their proceeds subject to the means by which the husband procured them, and who need not adopt his methods; and plaintiff's further argument that the burden of following with absolute identification the alleged stolen money into payment of premiums on the policy was placed upon the defendant, and was not and could not be shifted, but remained to the end of the case. Dayton's honesty had never been suspected by his employers until after his death, by suicide. Then it was discovered that he had been a defaulter and embezzler and forger, and the investigation as to the amount of his stealings, and the particular means by which he had accomplished his felonious purposes, was begun. He had made the investigation as difficult as possible, by the destruction of almost every paper referring to his transactions, and by the complicated manipulation of the funds he had embezzled. The investigation of Dayton's transactions, commencing at the time of his death, and being pursued backward, established clearly stealings from the defendant and its predecessor of upward of $30,000. The more remote the period being investigated, the difficulties of detecting the particular stealings were increased; but, notwithstanding this fact, at the time of the trial the defendant was able to produce proof, which to my mind is conclusive, and which was not met by any counter proof or explanation on the part of the plaintiff, showing that his stealings commenced as early as January 11, 1889, and continued from that time to the time of his death, in continued increasing amounts. During the year 1889, as I have already stated, the proofs show such stealings to have amounted to $397.90, and during the year 1890 to $979.06, being a total, prior to the payment of premium which I have called No. 1, of $1,376.96. The proofs

also clearly show that with the commencement of his thefts, or prior thereto, he had begun a life of general dissipation; and at that time his only source of legitimate income was the salary he received from this defendant or its predecessor, paid him in monthly installments, of $83.33 each.    So that on December 5, 1890, when he paid the premium No. 1 ($77.55), we find this state of facts existing:    Dayton was living with this plaintiff, his wife, in comfortable style, in a some- what pretentious house and neighborhood in Brooklyn.    His contri- bution to the household expenses is brought out in a general way upon the examination of the plaintiff herself, who was called as a witness by the defendant.    Her statement is that this contribution amounted to about $600 per year; and that was the amount she paid "out of the allowance made her" by her husband; and that, in addition to that, she had saved further moneys out of her husband's allowance, which were represented by certain deposits in her name with this defendant; and that this amount so allowed by him did not include his necessary personal living expenses.    The further fact appears from uncontradicted evidence that, prior to this date, Dayton had stolen from his employers at least the sum of upward of $1,400.

The first question I have to decide as to this payment of premium No. 1, with these undisputed facts before me, is whether the money used to pay that premium was honest money of Dayton's, or whether it was money stolen from the defendant or its predecessor.    Upon this state of facts, I am forced to the conclusion that every probability which should be taken into account on such an investigation requires, as a finding of fact, that Dayton was enabled to take out his policy, and pay the premium on it, because of his peculations from his em- ployers, and that he did pay it with their money.

Premium No. 2, paid May 22, 1891, in cash (as I must find to be the case from all the evidence), was, to my mind, undoubtedly paid with money of Dayton's employers.    At this time his stealings had in- creased to the sum of $3,370.70, he having embezzled so late as the 8th of May preceding, on a single occasion, the sum of $248.40.

Premium No. 3, which was the first premium on the second policy taken out by Dayton, was paid on September 10, 1891; and the irre- sistible conclusion from the testimony is that it was paid with the money embezzled or stolen from his employers.    His stealings during all the intervening time, since the payment of premium No. 2, were in steadily increasing amounts; and the very preceding day, September 9th, he had embezzled the sum of $263.10 in cash.

If my reading of the testimony had not otherwise induced me to reach the conclusions at which I have arrived, I should have been forced to them when applying to the evidence the principles laid down in New York & Brooklyn Ferry Co. v. Moore, 102 N. Y. 667, reported in full in 6 N. E. 293.    In that case, upon evidence much less direct than that offered by the defendant in the case at bar, the court im- pressed a trust upon all of the property of the defendant, Moore, the acquisition of which by him was not otherwise accounted for; the court of appeals holding that all the probabilities were that such ac- quisitions must have been the result of embezzlement from his em- ployers, although the proof of the embezzlements themselves was

based, not upon direct proof of any single particular theft, but upon proofs which showed the possibility and probability of such thefts. In that case, Moore, the defendant, was employed as a ferry master by the New York & Brooklyn Ferry Company, and in that capacity was in receipt of money, ferry tolls, which it was his duty to take over at night in a bag, and deliver to the officers of the company.    He kept no account, and was not required to keep any account, of the moneys he received during the day, and the company had no means of knowing how much he actually did receive.    After many years' employment, he was detected in taking money from the drawer, and pocketing it.    He was thereupon discharged by the ferry company, and an investigation of his affairs ensued, which resulted in the discovery that he held title to real estate worth some $15,000, and had in his name savings bank accounts of some $30,000.    The company thereupon brought suit against him in equity, alleging its belief that Moore had robbed them of large sums, but pleading ignorance of the amount of his stealings, when made, or how disposed of, and prayed for an accounting, and that these bank accounts and real estate in his name should be impressed with a trust in its favor for the amount shown thereby to have been stolen from it.    The proof in the case was of an entirely negative character.    It commenced by showing that Moore's parents were poor Irish emigrants; that his mother was a washerwoman; that his sisters went out to work as soon as they were old enough; and that his own employment prior to that by the ferry company had been as truck driver, at $7 a week.    It then showed his salary with the ferry company, commencing at $50, and rising to $60, and then to $75, and part of the time $80, per month; further, that he had no other business, and no other apparent means of making or earning any money; and the further fact was shown that, soon after entering into the employment of the ferry company, his style of living became better, and that, at the time of his discharge, he was in possession of the property before mentioned.    The defendant refused to take stand and offer any explanation of his accumulation of property, relying on the principle, which was afterwards sustained by the general term on appeal, that the duty rested on the plaintiff "from first to last, on the trial, to prove the embezzlement charged, and that the defendant was not required to prove or satisfy the court that the fact was not as alleged by the plaintiff against him; that the fact of embezzlement was not shown by proof of defendant's possession of property otherwise unaccounted for; and that he was not bound to reveal the sources of his wealth."    This decision of the general term was specifically reversed by the court of appeals; and upon the evidence, thus briefly outlined, which, as has been seen, did not disclose when any moneys were stolen, or how much was stolen, or when or how the stolen money was disposed of, the court proceeded to determine the amount, by crediting him with what, from the evidence, the court decided could probably have been saved by him from his earnings, and then, finding that these were all the moneys of Moore's that could be honestly accounted for, gave the ferry company judgment for the difference, some $22,000, and declared that it had a lien on the sav-

ings bank accounts and real estate for the amount of the judgment, as they necessarily were in part the proceeds of the stolen money.

In the case at bar the defendant has gone much further. It has proved specific thefts on particular dates, and the amount and method of the embezzlements are clearly shown, while, at the same time, the proof shows that Dayton could have had no legitimate savings from his salary of $1,200 a year, after having made the allowance to his wife of more than $600 a year, and, in addition, paying his necessary personal expenses, and leading the manner of life which the proof discloses. While, in the language of the court in the Moore Case, it may be possible that Dayton acquired other money honestly, all the evidence harmonizes with the theory that he did not acquire any other means except by theft from his employers. "The contrary may be possible, but courts, in weighing evidence and reaching conclusions, do not deal with possibilities, but with probabilities." I have therefore concluded that it is a fact that these two policies of life insurance were initiated by payment of premiums 1 and 3, with the money of the defendant.

Premium No. 4, paid November 24, 1891, was paid by the check of this defendant, and charged to an account standing in the name of this plaintiff on the books of the defendant, and which, at that time, according to her testimony, consisted of money belonging to her mother. This sum was loaned to her husband by the plaintiff, and, as the case is to be disposed of upon equitable principles, the amount thereof, $76, should be allowed the plaintiff out of the fund, with interest from the date of its payment.

Premiums Nos. 5, 6, 7, 8, 9, 10, 11, and 12 were paid by checks on the bank account of Dayton in the Liberty National Bank. Applying the same rule in weighing the evidence, each and all of these premiums must be held to have been paid with money of the defendant, and I have so found upon all the evidence. In that bank account were traced upward of $25,000 of the stolen money. During the period covered by the account, Dayton's stealings had vastly increased, both in frequency and in amount, and his mode of living was more and more extravagant, he having commenced to keep horses, joining clubs, attending races, etc. But, aside from this theory of weighing the evidence, I think each of the payments of premiums which I am now discussing was shown to have been the moneys of the defendant in another way by the analysis of the bank account prepared by the respective counsel, and the evidence in connection therewith. The account with the Liberty National Bank was opened on February 11, 1892, by the deposit of $500. On January 4th, preceding, Dayton had obtained from the defendant's cashier, by fraudulent representations, $500 in cash, and again, on February 8th, only three days before the deposit, a further sum of $500 in cash. Without reviewing at length all the evidence covering the preceding period, it is enough to say that, to my mind, every probability points to the fact that the $500 with which this bank account was opened was the money stolen from the defendant.

The fifth premium, and the first paid by check on the Liberty National Bank, was charged to Dayton's account on the 3d of March, 1892,—$57.45. The balance at the close of banking hours on March 2d, out of which this premium was paid by Dayton's check, was $1,472.03. The deposits during this period, from February 11th to March 2d, both inclusive, consisted of $500, with which the account was opened, and which I have found to have been stolen money,—two checks, one of $100, and one of $10, deposited on February 13th; $50 in cash on the 18th, and check for $600, which was identified as stolen. On February 11th, Dayton had fraudulently procured the defendant's check for $125, for which he obtained cash from one Joseph A. Reed. This was clearly proven to be stolen money, by the strictest rule of tracing trust funds. So that, as the proofs stand, from January 4, 1892, up to the 25th of February, we have traced into Dayton's possession, stolen from the defendant, $1,125 in cash and a check of $600. From the opening of the bank account, on February 11th, to February 25th, we find he deposited the said $600 check and $550 in cash, and $110 in two checks, which were simply given in exchange for cash. Against these deposits, aggregating $1,260, were charged withdrawals, up to the closing of banking hours, $287.97, leaving $973.02 balance, all of which should, upon the proof, be held to be stolen money. On March 2d, he made deposits aggregating $500,—$325 being in currency, $100 check on the First National Bank of Plainfield, which was specifically traced as stolen, and a check of $75 on the Second National Bank of Hoboken, not particularly identified. The $325 in currency, I think, under every reasonable rule of weighing evidence, should be held to be a portion of the cash stolen by Dayton during the preceding month, he having had, as we have seen, on this date, $575 of the $1,125, which was not otherwise traced. The $75 check on the Hoboken Bank, while not particularly identified, I think, must reasonably be held to be simply an exchange for a check of like amount paid by the Liberty National Bank on February 25th, and which I have not, therefore, included in the above statements of withdrawals up to that date. These deposits left Dayton with a balance, at the close of banking hours on March 2d, of $1,472.03, all of which, in my opinion, was stolen money. At any rate, it was out of this balance that the check in payment of this premium, No. 5, was made. But, assuming that the $75, unidentified check, was to be presumed as honest money, the fact would be that this defendant has traced most laboriously, through all the channels adopted by Dayton to make the tracing more difficult, the sum of $1,397.03, as stolen out of a total of $1,472.03.

On this state of facts, the plaintiff's contention would be that because $75 must be presumed to be honest money, and was sufficient to meet the check given for this premium, namely $57.45, therefore it must be found as a fact that the payment was made out of this $75, rather than out of the large balance which I have found to be stolen money. The contention as to this premium

which plaintiff's counsel actually made, after stating the deposits as I have given them, is this:

"For the purpose of this analysis, it is only necessary to claim that the currency is unidentified:

| | | |
|---|---|---|
| Currency | $375 | 00 |
| Total drawings prior to March 3, 1892 | 287 | 97 |

Balance currency after charging all drawings................ $ 87 03
—Leaving more than enough to pay the premium check of $57.45, which was the next check paid."

Even had I not found as a fact that the currency $375 was proven to be stolen money, I think the plaintiff's contention would still be quite wrong. This is the fundamental difference to which I alluded in the early part of this opinion, for it is briefly this: That, although traced by the strictest rule of identification into the very balance against which the check is drawn, of so large a proportion of the amount, if that part remaining unidentified is sufficient to meet the check, the court must presume that the check was paid out of that unidentified balance, which it must also presume to have been honest money; and this upon the theory that there is no means by which the defendant in this case could recover money proven to have been stolen from him, or the proceeds of it, without absolute identification and tracing of the very money into the premium payment,—that is, that that burden was placed upon it in the beginning, and was not shifted, at any time or in any way, upon the plaintiff; but the plaintiff, as Moore, in the New York & Brooklyn Ferry Co. Case, did, may sit by and offer no aid as to the identification of the fund being examined, although proof stands that, up to this date, the total stealings of Dayton from his employers aggregated the sum of $7,713.65, and claim that, if the defendant failed to identify the last $57.45 in that particular balance, then he has failed to prove the payment of the premium out of the $7,000 theretofore stolen, and the court must presume that it was paid with the $57.45, so-called "honest money." I do not understand this to be the rule of law. I have read carefully all the cases cited by the learned counsel for plaintiff, and cannot discover that they in any way change the rule of weighing evidence in this case which I have adopted, and which I have felt compelled to follow, under the decision in New York & Brooklyn Ferry Co. v. Moore. Having arrived at the findings of fact as I have under the rule there laid down, in applying the law applicable to the facts so found, I find it clearly settled in the case of Holmes v. Gilman, 138 N. Y. 369, 34 N. E. 205.

The cases cited by the plaintiff are cases laying down the rule for tracing "trust funds," and, as the plaintiff's counsel himself states, "they are cases in which some particular fund has come within the jurisdiction of the court, like the estate of a decedent or insolvent, or assets of some corporation"; but he does not follow on to what, to my mind, is the great distinction between those cases and the one at bar,—that the claimants of the fund in dispute were people having equal equities and equal rights in its dis-

tribution, except for the claim of a special lien made by the alleged. cestui que trust. The plaintiff's counsel seems to have ignored this point, and refused to give it any weight, because he has assumed that the plaintiff stood as an innocent third person; whereas she stands, as the court says in Holmes v. Gilman, in her husband's shoes, "claiming the policy subject to the means by which the husband procured it, in adopting all his methods." ·

The distinction, it seems to me, is clear between this and the cases cited by the plaintiff's counsel, some of which are the following:

Bank v. Armstrong, 148 U. S. 50, 13 Sup. Ct. 533. Armstrong was receiver and trustee for all the creditors of the Fidelity Bank of Cincinnati. The supreme court, in its decision (page 58, 148 U. S., and page 535, 13 Sup. Ct), sets aside the ground of Judge Jackson's opinion below, holding that the relation of the parties was debtor and creditor, and that, when such relation exists, funds collected pass into the general estate, and no equitable lien attaches.

The case of Peters v. Bain, 133 U. S. 676, 10 Sup. Ct. 354, is the case of one creditor against a trustee for the benefit of all the creditors.

Cavin v. Gleason, 105 N. Y. 256, 11 N. E. 504, was the case of one creditor attempting to assert an equitable lien while Gleason was assignee for all the creditors who claimed the same equitable rights.

Sugar-Refining Co. v. Fancher, 145 N. Y. 552, 40 N. E. 206. Fancher was assignee, asserting the rights of other creditors to the fund; and in that case Judge Andrews (at page 556, 145 N. Y., and page 207, 40 N. E.) says:

"The jurisdiction of a court of equity to follow the proceeds of property taken from the true owner by felony, or misapplied by an agent or trustee, and converted into property of another description, and to permit the true owner to take the property in its altered state as his own, * * * or, in case the original property or its proceeds have been mingled with that of the wrongdoers in the purchase of other property, to have a charge declared in favor of the person injured to the extent necessary for his indemnity, so long as the rights of bona fide purchasers do not intervene, has been frequently exerted, and is a jurisdiction founded upon the plainest principles of reason and justice."

The rule laid down in Bank v. Hume, 128 U. S. 211, 9 Sup. Ct. 46, which has been frequently pressed upon my attention throughout the brief of the plaintiff, does not change the rules I have referred to in any way. It is cited in connection with the plaintiff's contention that courts of equity and the statute in this state favor the provision by a man for his wife and family by means of life insurance. Chief Justice Fuller says:

"It seems to us that the same public policy which justifies this, and recognized the support of wife and children as a positive obligation in law as well as morals, should be extended to protect them from destitution after the debtor's death, by permitting him, not to accumulate a fund as a permanent provision, but to devote a moderate portion of his earnings to keep on foot a security for support already, or which could thereby be, lawfully obtained,

at least to the extent of requiring that, under such circumstances, the fraudulent intent of both parties to the transaction should be made out."

There the court is discussing a question between the right of a widow and the claim of the husband's creditors, and speaks of the provision made from his earnings. The title to the moneys was in the husband, and he used his own property to procure the insurance.

In this case, however, I now cite from the opinion of the court of appeals in Holmes v. Gilman, 138 N. Y. 384, 34 N. E. 209, in distinguishing this very case (Bank v. Hume):

"In this case, however, there is the fact which alters and colors the whole transaction, and is fundamental and controlling in its nature; and that fact is that the moneys which procured the insurance were trust moneys, and, although invested in policies, they were subject, at the very moment of such investment, to the rights of the owner of the funds to follow them into whatever change or form they might assume, and to claim the thing into which they were changed, as if it were the original fund."

Or applying the language of the learned referee in his opinion in the same case (Sup.; 18 N. Y. Supp. 62), changing only the names, to apply to the parties in the suit at bar:

"Here the money with which the premiums were paid, and the policies procured, was not the money of the plaintiff or her husband. They were stolen moneys, stolen by Dayton from the defendant and its predecessor. He acquired them by crime. All his subsequent dealings with them—retention, possession, use, investment—were criminal continuations or extensions of the original felonious acts. Having no title to them, he could confer no title upon any other person not a transferee for value and in good faith. He could confer no title upon his wife by gift. He could not invest the money in any way for her benefit, so that she could acquire title to or interest in the investment as against the party from whom the moneys had been stolen. He could not contract with them for the future benefit of his wife, purchasing from her the bond or obligation of an insurance company to pay her money upon his death."

I have dwelt at this length upon the payment of premium No. 5 because it explains the theory upon which I have decided as to each of the payments made by check on the Liberty National Bank.

Premium No. 6 was paid by check on the 24th of May, 1892. The same rules as I have adopted show clearly that this check must be held to have been paid out of stolen funds.

Premium No. 7 was paid by check on September 8, 1892. The balance out of which this check was paid must be held to be money of the defendant, the larger portion of which was absolutely identified and traced; and those items which plaintiff claims are unidentified, I am bound to hold, as matter of fact, were, by all the probabilities of the evidence, stolen.

Premium No. 8 was paid November 26, 1892, by check on the bank account, and charged out of the account on November 28th. The particular balance out of which this check was paid is made up of numerous transactions of exchanges, etc., but originated, I think, clearly under the proof, with stolen funds, and in view of the fact that Dayton's stealing at this time had increased to an aggregate of upward of $15,000, a large portion of which had been traced into the bank account, prior to this date. It cannot be true

that plaintiff's contention is correct, that the court must assume the check to have been paid from honest money, and because there may have been a few small items, aggregating a few hundred dollars, at the most, which were not, according to his theory, "identified."

Premium No. 9 was paid by check March 11, 1893, and is conceded to have been paid from the proceeds of a stolen check.

Premium No. 10 was paid on the 23d of May, 1893, by check, which was charged to Dayton's account on the bank on the 29th of May. This was clearly stolen money. The only check deposited which could throw any doubt upon it was that of Seymour Bros. & Young, which was the result of a stock speculation carried on by Dayton in the name of one Downs. But this speculative account itself was clearly opened with the stolen funds of this defendant, and, although the particular transaction upon which this check was paid shows a profit, the net results of Dayton's stock speculations was a large loss.

Premium No. 11 was paid by check, charged out of Dayton's account on October 19, 1893. This I find from the evidence to have been paid from stolen moneys. The plaintiff's counsel disposed of it by referring to deposit on October 18th, of $150, "not stolen." This $150 was an exchange with Reed. The exchanges with Reed can be explained only by tracing them back to balances which were clearly identified as stolen.

Premium No. 12, and the last paid by check on the bank account, was charged to Dayton's account on December 4, 1893. This is conceded to have been a part of the Rupp check, which was identified as stolen.

The last premium paid, and the only one remaining to be considered, was on March 12, 1894, by a check of one George Alexander, which, the proof went to show, was a part payment for the purchase of a horse which Alexander testifies was sold to him by Dayton for $125, at that time. Without characterizing the testimony of Alexander, or alluding to the circumstances which might have caused bias in favor of the plaintiff, I think it is enough to say that the horse for which this was claimed to have been the payment must, on all the testimony, be presumed to have been purchased with stolen money. We find this horse was taken to Dayton's livery stable about six months previous to this date, making two horses during that period which he kept at livery, at a time when the testimony shows he was living a life of extravagant dissipation, and had stolen at the time upward of $30,000 from his employer.

On the facts, as I have found them, the first premiums paid on each of the policies have been paid with moneys stolen from the defendant. Both policies were thereafter maintained with stolen funds, except as to premium No. 4, the amount of which was shown to have been the loan to Dayton by this plaintiff, his wife, of money belonging to her mother. Under the rule in Holmes v. Gilman, the policies and their proceeds belong to the defendant, subject, at most, to an equitable lien of plaintiff for the amount of her money

which entered into their maintenance, with interest from the date of its payment.

The other questions raised by the plaintiff, by motion at the end of defendant's case, I have reconsidered, but find no reason to change the opinion I expressed on the decision of those motions.

My decision as to motion 7 must stand after hearing the whole case. No evidence has been introduced by the plaintiff to make a different decision necessary. And I hereby reaffirm my decision as to motions 8 and 9.

I am of the opinion, therefore, that judgment should be rendered in favor of the defendant, awarding it the entire fund in court, less the sum of $76, with interest from November 24, 1895.